IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| AARIN L. MOSS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00014 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| SAJA RESTAURANT GROUP, | ) | By:   Hon. Thomas T. Cullen |
| LLC, d/b/a SONIC, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Aarin Moss ("Moss") brings this civil rights action against Defendant Saja Restaurant Group ("Saja"), claiming that he was discriminated against based on his race and disability in violation of Title VII, the Americans with Disabilities Act ("ADA"), and the Virginia Values Act ("VVA"), and that he was fired in retaliation for opposing unlawful discrimination directed at him in his workplace. Saja has moved for summary judgment on each of Moss's claims. (ECF No. 43.) The motion has been fully briefed by the parties, and the court heard oral argument on April 10, 2023, making the matter ripe for disposition. After reviewing the pleadings, briefs, and factual record, the court will deny Saja's motion as to Count I and the ADA portion of Count III, but will grant its motion as to Count II and the Title VII portion of Count III. Additionally, given the nature of Moss's state law claims, the court will dismiss Counts IV and V without prejudice.

## I.   BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Moss. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiff Aarin Moss is a 23-year-old biracial man[1] with significant intellectual and physical challenges. Specifically, Moss has a learning disability and borderline autism. (Dep. of Stephanie Holloway 19:8–17, Mar. 2, 2023 [ECF No. 45-2].) He also suffers from a severe lung disease called primary pulmonary arterial hypertension ("PAH"), which required him to undergo a double lung transplant when he was 16 years old.[2] (Moss Dep. 8:10–18; Holloway Dep. 14:23–15:14, 84:17–23.) As a result of his lung transplant, Moss was placed on a variety of antirejection medications including Prednisone, which deteriorates his bones and lower lumbar which, in turn, resulted in osteoporosis. (Holloway Dep. 16:9–17:9.) Given his physical challenges, Moss must take breaks throughout the day and sometimes cannot perform daily tasks due to his pain. (*Id.* 18:17–19:7; Moss Dep. 9:18–10:4, 13:1–14.)

Despite these physical limitations, in October 2019, Moss began working as a carhop at a Waynesboro, Virginia Sonic restaurant owned by Saja.[3] (*Id.* 26:15–22; Moss Dep. 7:24–8:2.) At the beginning of his employment, Moss told Taylor Davis ("Davis"), the store manager, that he would need to take breaks when he was in pain, an accommodation that Davis approved. (Moss Dep. 49:4–50:3.) Moss continued working as a carhop until the outbreak of the COVID-19 pandemic forced him to take a leave of absence, which was also approved. (*Id.* 51:18–52:2; Holloway Dep. 28:25–30:13.) Moss returned to work in August or

---

[1] Moss's mother is White and his father is Black. (Dep. of Aarin Moss 30:21–31:2, Jan. 5, 2023 [ECF No. 44-2].)

[2] On January 13, 2016, Moss became the first successful pediatric double lung transplant patient in the history of the University of Virginia Medical Center. (Holloway Dep. 14:23–15:14.) Though Moss's transplant was a success, he will eventually need another lung transplant once his current lungs inevitably fail. (*Id.* 17:10–18:11.) When such transplant is needed, doctors will open his sternum—which is currently held together by a metal wire—and put two new lungs inside of him. (*Id.* 16:9–16; Moss Dep. 17:8–10.)

[3] Saja owns and operates approximately nine Sonics in addition to its Waynesboro location. (Dep. of Tracy Lloyd 8:17–23, Mar. 2, 2023 [ECF No. 45-4].)

September of 2020 once the pandemic subsided, but he returned as a cook because his doctors wanted to limit his contact with the public. (Holloway Dep. 29:6–17.) Up until that point, Moss acknowledges he had not experienced any workplace discrimination based on his race or disabilities. (Moss Dep. 14:20–23, 31:15–19, 96:15–97:7.)

This status quo continued until June of 2021, when Saja hired Joe Maturo ("Maturo"), who Moss contends began bullying him despite being aware of his disability. (*Id.* 13:21–14:23, 37:2–14.) Indeed, despite being "chill" at first (*id.* 38:6–11), Moss recounts several instances of bullying perpetrated by Maturo between mid-June and July 4, 2021, despite only working together five times[4] during that period. Specifically, Moss testified that Maturo's bullying began during one of their shifts in mid-June while Moss was working the hot dog station. (*Id.* 38:15–39:5.) Maturo apparently took issue with the way Moss prepared hot dogs and told him, "Are you just going to sit there? Look at that f*cking order. Or are you going to do your f*cking job?" (*Id.*) Thereafter, between mid- and late-June, Moss testified that Maturo "would make slick comments" regarding his disability and tell him to "get [his] lazy ass up," to stop "using [his] disability as an excuse and [his] pain as an excuse," that "[he] needed to start picking up slack," and that he was "a weak little b*tch." (*Id.* 14:1–13, 41:5–8.)

Maturo's bullying prompted Moss to complain to his manager "[a]bout four or five, six times." (*Id.* 47:15–17.) Despite ensuring Moss that "she was going to deal with it," Davis did nothing, and Maturo's bullying continued through July 4, 2021—the last day Moss worked for Saja. (*Id.* 14:25–15:5, 70:24–71:4.)

---

[4] According to Saja's employee timecards, Moss worked June 5, 6, 13, 27, and July 3 and 4 of 2021. Maturo worked all those days except for July 3, 2021. (Tracy Lloyd Decl. ¶ 2, Ex. 1, Mar. 13, 2023 [ECF No. 44-3].)

On July 4, 2021, Moss and Maturo's tumultuous relationship came to a head. That evening, Moss asked Maturo or another coworker, Mason McCloskey, to drop another order of Pickle-O's (*i.e.* a fried pickle item on Sonic's menu), to which Maturo responded, "[J]ust come back here and fix it your f*cking self." (*Id.* 19:2–18.) Maturo then told Moss that he would make him "his b*tch," and make Moss "s*ck his d*ck." (*Id.* 14:1–23; 56:8–12.) Moss and Maturo began to argue and Moss claims that Maturo threatened to fight him in the parking lot. (*Id.* 15:12–20, 56:20–57:6.) Davis then allegedly said that Moss and Maturo were not permitted to fight in the Sonic parking lot, but that they could "take it to the Walmart parking lot," which is located behind the Sonic. (*Id.*)  Moss then went to the bathroom, called his mother, Stefanie Holloway ("Holloway"), and told her that "he didn't know if he was going to get jumped," and that she needed to pick him up. (*Id.* 61:23–62:2; Holloway Dep. 46:22–47:3.) Holloway "threw some shoes on" and arrived in the Sonic parking lot about 20 minutes later. (Holloway Dep. 40:10–18, 47:8–15.)

When Holloway arrived, Moss's brother, Christian, was already in the parking lot[5] speaking sternly with Maturo, who had previously made his way to the parking lot. (*Id.* 42:10–21.) During their conversation, Christian told Maturo to "[s]top picking on my little brother. He can't help—medical things he can't do." (Moss Dep. 20:24–21:11; Holloway Dep. 42:15–21.) Holloway then told Christian to leave, which he did within a couple of minutes. (Holloway Dep. 42:22–24, 45:5–6.) Once Christian left, Holloway asked Maturo, "[W]hat the hell is your problem with [Moss] and why do you keep harassing him?" (*Id.* 47:16–24.) Maturo responded

---

[5] It is unclear how Christian became aware of July 4, 2021 incident, or how he knew to go to the Sonic parking lot. (Holloway Dep. 42:10–13.)

that "[Moss] takes too many breaks and sits down all the time and Fs me over as his teammate, and I'm sick of him faking like he's sick." (*Id.* 47:25–48:3.) Holloway then explained that "[Moss is] not faking. He had a double lung transplant, and his bones are deteriorating. And [Maturo is] stressing him out, and [Moss] hasn't done anything to [Maturo]. And [Maturo is] not his boss." (*Id.* 48:5–9.) Following this exchange, Maturo told Moss, "I'm going to get you, you snitch a*s b*tch," before walking back inside the Sonic. (*Id.* 49:15–22.) Davis saw this whole confrontation from inside of the Sonic but declined to speak with Holloway; Davis merely watched the scene unfold through the window, rolled her eyes, and walked away. (*Id.* 50:6–16.)

Shortly thereafter, two minor female employees, Jade and Serenity, "came outside and started yelling at [Holloway]. And then Jade and Serenity was trying to walk up on [Holloway], and [Moss] stepped in. And Jade pushed [Moss] in [his] chest, and Jade and Serenity were throwing around the n-word and [Moss] tried to break it up." (Moss Dep. 22:2–7.) Specifically, when Moss "stepped in," Jade and Serenity told him, "[m]ove out of the way, n*gger, move out of the way." (*Id.* 22:14–19.) Holloway immediately threatened to call the police and Sonic corporate, but Serenity looked at her and said, "Sonic isn't going to do sh*t, and even if they do, I don't give a f*ck." (Holloway Dep. 53:18–20.) Moss then attempted to go back inside to get his tip money before leaving, but Davis "crumpled it up, threw it at him, and told him to get the F out while . . . Jade, Serenity, and [Maturo], all were back on the line working." (*Id.* 53:23–54:7.) Moss then walked to his mother's car and she called the corporate complaint line. (*Id.* 54:8–19.)

- 5 -

Later that night, Tracy Lloyd, Saja's Director of Operations, received Holloway's complaint regarding the incident in the Waynesboro Sonic parking lot; the next day, he called Holloway. (Lloyd Dep. 5:23–6:10; Holloway Dep. 62:11–12; Lloyd Decl. ¶ 5.) After speaking with Holloway, Lloyd "immediately began an investigation of the situation, including a telephone call with [Davis] about the incident and in-person interviews with employees present" on July 4, 2021. (Lloyd Decl. ¶ 6.) As a result of his investigation, Lloyd terminated Davis, Serenity, Jade, and would have fired Maturo, but he had already quit. (*Id.* ¶ 7.) Nobody from Saja spoke with Moss, and he was thereafter removed from the schedule. (Moss Dep. 67:19–24, 70:8–12.)

Following these events, Moss filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the Virginia Council on Human Rights on or about October 8, 2021. (Compl. ¶ 4 [ECF No. 1]; EEOC Charge [ECF No. 45-1].) Moss received his Notice of Right to Sue from the EEOC on February 11, 2022, but never requested or received one from the Virginia Council on Human Rights. (*Id.*; Moss Dep. 93:23–95:20; EEOC Notice of Right to Sue [ECF No. 44-4].) Moss subsequently filed this action on March 15, 2022, within 90 days of receiving the EEOC Notice of Right to Sue. (*See* ECF No. 1.)

Moss's complaint asserts five distinct claims: disability harassment and discrimination in violation of the Americans with Disabilities Act ("ADA") (Count I); race discrimination and harassment in violation of Title VII of the Civil Rights Act (Count II); retaliation in violation of the ADA and Title VII (Count III); disability harassment and discrimination in violation of the Virginia Values Act ("VVA") (Count IV); and race discrimination and

harassment in violation of the VVA (Count V).[6] (*Id.* ¶¶ 59–90.) Saja has moved for summary judgment on each of Moss's claims. (ECF No. 43.) The motion has been fully briefed by the parties and the court held oral argument on April 10, 2023, making the matter ripe for decision. For the following reasons, Saja's motion will be granted with respect to Count II and the Title VII portion of Count III, but denied as to Count I and the ADA portion of Count III. Additionally, given the nature of Moss's VVA claims asserted in Counts IV and V, the court will dismiss those claims without prejudice.

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248–49). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (cleaned up).

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the

---

[6] In his opposition, Moss clarified that Counts I and II assert claims for both discrimination *and* harassment—not just hostile work environment. (Pl.'s Br. Opp. p. 13 [ECF No. 45].) But at the April 10, 2023 hearing, Moss conceded that his race discrimination claim in Count II fails. As such, the court will only evaluate his race harassment claim in Count II.

nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (cleaned up). The evidence relied on must proffer "sufficient proof, in the form of admissible evidence, that could carry the burden of proof" at trial. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

## III.   ANALYSIS

### A.   Moss's Disability Harassment and Discrimination Claims (Count I)

As an initial matter, there is some confusion between the parties as to which claims are asserted in Count I. Saja argues that Count I asserts only a claim for hostile work environment. (Def.'s Br. Supp. Summ. J. p. 9 [ECF No. 44]; Def.'s Reply Br. p. 7–8 [ECF No. 48].) Moss counters that Count I, in fact, asserts claims for both disability harassment *and* discrimination. (Pl.'s Br. Opp. p. 13–14.) Accordingly, in the light most favorable to Moss, the court will construe Count I to assert claims for both disability harassment and discrimination and evaluate each claim in turn.

### 1.  Disability Discrimination

To establish a claim for disability discrimination under the ADA, Moss must prove "(1) that []he has a disability, (2) that []he is a 'qualified individual' for the employment in question, and (3) that [his employer] discharged h[im] (or took other adverse employment action) because of h[is] disability." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (cleaned up) (quoting *EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373, 377 (4th Cir. 2000)). Since Saja makes no argument with respect to elements one and two, the court will only evaluate the third element. And the court concludes that a reasonable factfinder could believe that Saja discharged Moss because of his disability.

After Moss complained to Davis "[a]bout four or five, six times," (Moss Dep. 47:15–17) about Maturo's bullying on account of his disability, the issue reached a climax on July 4, 2021. On that day, Maturo again bullied Moss because of his disability in the presence of his mother (Holloway), brother (Christian), and Davis herself. (Holloway Dep. 50:6–16.) And when Holloway requested to speak with Davis about Maturo's conduct, Davis declined, and instead told Moss to "get the F out of her store," crumpled his money up, and threw it at him. (*Id.* 50:6–16, 53:21–54:7.) Accordingly, a jury could believe that Moss was actually or constructively terminated[7] at this point; in fact, he never worked another day for Saja.

---

[7] Constructive discharge may constitute an adverse employment action for purposes of the ADA. *See Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 239 (4th Cir. 2018). To prove constructive discharge, a plaintiff must demonstrate "(1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). In this case, there is no dispute that Davis, acting as Saja's store manager, told Moss to "get the F out of her store," and that Moss left as a result of the harassment he was suffering on July 4, 2021. Saja also concedes that there is a dispute as to whether Moss was fired. (Def.'s Br. Supp. Summ. J. at 14.)

Despite these genuine factual disputes, Saja does not present an argument on this claim, in either its motion or reply, save for its contention that Count I does not include a claim for ADA discrimination. In other words, Saja moved for summary judgment because it does not believe that this claim is pleaded. But as noted above, the court reads Count I to assert this claim, so Saja's only asserted grounds for summary judgment is rejected.

Accordingly, because Saja has not shown that there is no genuine dispute of material fact with respect to the elements of this claim, its motion for summary judgment will be denied with respect to the ADA discrimination portion of Count I.

### 2. Disability Harassment

Saja contends that Moss's claim for disability harassment fails because he cannot establish "that the handful of incidents with Maturo" were objectively severe or pervasive, in part because the conditions of Moss's employment were not substantially altered by Maturo's bullying. (Def.'s Br. Supp. Summ. J. at 11–12.)

For Moss to establish a prima facie case for disability harassment under the ADA, he must establish that: "(1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Fox v. General Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). Here, Saja makes no argument with respect to elements one, two, and five. As such, the court will only evaluate whether the harassing conduct was based on Moss's disability and whether it was sufficiently severe or pervasive.

First, there are genuine factual disputes as to whether Maturo bullied Moss because of his disabilities. Although Saja argues that "Moss did not testify to any comments by Maturo that directly relate to his disability," (Def.'s Br. Supp. Summ. J. at 11), the court disagrees because the record, viewed in the light most favorable to Moss, belies this argument. Indeed, despite Maturo's knowledge that Moss's disability required him to take breaks (Moss Dep. 37:2–11), Maturo told Moss to "get [his] lazy ass up," to stop "using [his] disability as an excuse and [his] pain as an excuse," that "[he] needed to start picking up slack," and that he was "a weak little b*tch." (*Id.* 14:1–13, 41:5–8.) And on July 4, 2021, after threating to fight Moss (*id.* 15:12–20), Maturo told Holloway that "[Moss] takes too many breaks and sits down all the time and Fs me over as his teammate, and I'm sick of him faking like he's sick." (Holloway Dep. 47:25–48:3.) These comments directly relate to Moss's disability because they imply that Moss was "faking" his disability, "using his disability as an excuse," or otherwise being "lazy." As such, a jury could believe that Maturo's comments were directed at Moss because of his disability.

As to the fourth element, contrary to Saja's argument, a reasonable jury could believe that Maturo's harassment of Moss was sufficiently severe or pervasive. "To recover on a hostile environment claim, a plaintiff must demonstrate not only that he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." *Fox*, 247 F.3d at 178.

Because Saja does not dispute that Moss subjectively perceived his work environment to be hostile, the only question for the court is whether it was objectively hostile. To answer that question, courts consider "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "But the ultimate inquiry is whether the conduct is so extreme that it amounts to a change in the terms and conditions of employment." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 408 (4th Cir. 2022) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). And while "an isolated incident of harassment, if extremely serious," can suffice to create a hostile work environment, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 268 (4th Cir. 2015), evidence of mere "rude treatment" or "callous behavior" ordinarily does not suffice. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008). Applying these principles here, a reasonable jury could conclude that Moss's work environment was objectively hostile due to Maturo's harassment.

First, as to the frequency of the discriminatory conduct, Saja argues that Moss and Maturo only worked together five times and that these were "isolated incidents" of harassing conduct. But this treatment happened nearly every day that Moss worked during the relevant time period. (*See* Tracy Lloyd Decl. ¶ 2, Ex. 1.) Indeed, Moss worked six times between mid-June and July 4, 2021, and Maturo worked with him on all of those occasions except for July 3; in other words, on over 80% of Moss's shifts after his returned to work, he was subjected to Maturo's threatening and demeaning conduct. (*Id.*) As such, a reasonable jury could believe that Moss's harassment was pervasive.

Second, a reasonable jury could conclude that Maturo's conduct was severe; he frequently swore at Moss, disparaged his disability, and even threatened him with sexual and physical violence. (Moss Dep. 14:1–13, 15:12–20, 41:5–8.) Matturo's taunting and threats also

culminated in a physical altercation where two other employees tried to hit Moss's mother and pushed Moss in his chest. (Holloway Dep. 16:9–16; Moss Dep. 17:8–10, 22:2–7.) Maturo is also much bigger than Moss,[8] a fact that undoubtedly increases the seriousness of his verbal and physical harassment. And near constant torment by a co-worker would certainly interfere with one's work performance, as indicated when Moss called his mother because he no longer felt safe working at Sonic. As such, there is a genuine dispute of material fact as to whether Maturo's harassing conduct was sufficiently severe or pervasive.

In resisting this conclusion, Saja points to Chief Judge Urbanski's decision in *Newell v. Carter Bank & Trust* to support its argument that Maturo's conduct did not have the requisite impact on Moss's job performance (Def.'s Reply Br. at 9), but that case is readily distinguishable. In *Newell*, a plaintiff sued her former employer, alleging that it created a hostile work environment on the basis of her age and disabilities. No. 4:21-cv-007, 2022 WL 801601, at *8 (W.D. Va. Mar. 15, 2022). In holding that the plaintiff had failed to demonstrate facts supporting a hostile work environment, the court determined that jokes, comments implying her employer's preference for hiring younger employees, comments about the plaintiff's plans for retirement, and management's checking the plaintiff's work due to her eye-problems, were not severe or pervasive because they did not impact the plaintiff's job performance. *Id.* Instead, the court characterized the harassing conduct as merely "rude." *Id.*

In contrast to *Newell*, the harassment Moss alleges by Maturo was far more serious. It was severe enough for Moss to complain to Davis and call Holloway and request to be picked-

---

[8] Maturo is approximately six feet tall and weighs approximately 200 pounds, while Moss is five foot seven inches tall, and weighs around 120 pounds. (Moss Dep. 12:1–7; Holloway Dep. 55:23–25.)

up from work, which directly evinces a negative impact on his ability to perform his job. Indeed, nearly every time Moss went into work after Saja hired Maturo, despite his knowledge of Moss's disability, Maturo told Moss to "get [his] lazy ass up," to stop "using [his] disability as an excuse and [his] pain as an excuse," that "[he] needed to start picking up slack," and that he was "a weak little b*tch." (Moss Dep. 14:1–13, 41:5–8.) And on July 4, 2021, after threating to fight Moss (*id.* 15:12–20), Maturo told Holloway that, "[Moss] takes too many breaks and sits down all the time and Fs me over as his teammate, and I'm sick of him faking like he's sick." (Holloway Dep. 47:25–48:3.) Finally, unlike the plaintiff in *Newell*, the harassment Moss suffered prompted him to complain to Davis "[a]bout four or five, six times," (Moss Dep. 47:15–17), and call Holloway during his July 4, 2021 shift and ask to be picked up instead of continuing to work that evening (*id.* 61:23–62:2; Holloway Dep. 46:22–47:3). As such, a reasonable jury could find that Maturo's harassing conduct was severe and pervasive.

Accordingly, Saja's motion for summary judgment will be denied as to Moss's disability harassment claim in Count I.

## B. Moss's Race Harassment Claim (Count II)

Saja argues that Moss cannot sustain a claim for racial harassment because he never experienced racial discrimination or harassment and because his race-based claims are predicated on a single vile incident occurring on July 4, 2021. (Def.'s Br. Supp. Summ. J. at 12.) In other words, Saja argues that the conduct at issue was not sufficiently severe or pervasive to constitute race-based harassment under Title VII.

"When racial animus in the workplace creates a hostile work environment, requiring an affected employee to work in it amounts to intentional racial discrimination by the employer

and is actionable under Title VII." *McIver*, 42 F.4th at 407; *see Boyer-Liberto*, 786 F.3d at 276–77 (citing 42 U.S.C. § 2000e-2(a)(1)). For Moss to establish a prima facie case for Title VII harassment, he must demonstrate "(1) unwelcome conduct; (2) that is based on [his] race; (3) which is sufficiently severe or pervasive to alter [his] conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277 (cleaned up) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). Here, elements one and two are not in genuine dispute. The harassing conduct was surely unwelcome, and the use of a racial epithet was based on Moss's race. As to the third element, however, no reasonable jury could find that the harassing conduct was sufficiently severe or pervasive.

A hostile work environment claim will only succeed when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21). "The severe or pervasive conduct which gives rise to an abusive work environment must be both objectively and subjectively hostile and abusive."[9] *McIver*, 42 F.4th at 407 (cleaned up). Accordingly, "a plaintiff must demonstrate not only that he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." *Fox*, 247 F.3d at 178.

---

[9] Moss need not establish a psychological injury, however; "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris*, 510 U.S. at 22.

Saja does not dispute that Moss subjectively perceived his work environment to be hostile, only that it was not objectively hostile. As discussed previously, to determine whether Moss's work environment was objectively hostile, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "But the ultimate inquiry is whether the conduct is so extreme that it amounts to a change in the terms and conditions of employment." *McIver*, 42 F.4th at 408 (quoting *Faragher*, 524 U.S. at 788). "Even conduct that would objectively cause hurt feelings or offense is not enough to be severe or pervasive." *Id.* (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315). Applying these principles, no reasonable jury could find that Moss's work environment was objectively hostile due to racial discrimination or harassment.

Moss's entire claim related to racial harassment stems from a single incident in which two underage Saja employees, Jade and Serenity, called him a "n*gger" on July 4, 2021. While this epithet is reprehensible and its use is condemned by the court, it does not rise to the level of being severe or pervasive for the purposes of a race-based Title VII claim. Indeed, prior to July 4, 2021, Moss never had any issues with race-based discrimination or harassment, either with his coworkers or supervisors. (*See* Moss Dep. 96:23–97:7.) The July 4, 2021 incident was the only time someone directed a racial epithet at Moss. (*Id.*) As such, this one-off incident does not rise to the level of being sufficiently severe or pervasive. *See Faragher*, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *Currie v. Arthur*, No. 1:11-cv-892, 2012 WL 1715390, at *7 (E.D. Va. May 15, 2012) ("[T]here must be more than a few isolated incidents

- 16 -

of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments").

Moss disagrees, relying on the Fourth Circuit's ruling in *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015), for the proposition that an isolated incident of racial harassment can constitute severe or pervasive conduct. (Pl.'s Br. Opp. at 17.) While Moss is correct that a single isolated incident can be sufficient to make out a discrimination claim, the facts here do not support his argument.

In *Boyer-Liberto*, the Fourth Circuit held that a reasonable jury could find that two uses of the odious phrase "porch monkey" was severe enough to constitute a hostile work environment. 786 F.3d at 280. But the Fourth Circuit expressly based its holding on the fact that the racial epithets were used by a supervisor. *Id.* ("Clubb employed racial epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate Liberto's employment."). In contrast to *Boyer-Liberto*, the racial epithet in this case was uttered by minor *coworkers*, not a manager. Jade and Serenity did not exercise any managerial discretion over Moss and were not backing up threats of discharge in the same way as the manager in *Boyer-Liberto*. Without some sufficiently aggravating factor, this single instance in which a racial epithet was used by *coworkers* does not rise to the level of being severe or pervasive. *See id.* at 278 ("In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of a racial epithet impacts the work environment far more severely than use by co-equals." (cleaned up) (quoting *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

- 17 -

Accordingly, Moss's Title VII harassment claim fails and Saja's motion for summary judgment will be granted as to Count II.

### C.  Moss's Retaliation Claims (Count III)

Turning to Moss's retaliation claims, the ADA's retaliation provision provides, in relevant part, that "[n]o person shall discriminate against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). Similarly, Title VII proscribes discrimination against an employee because he "has opposed any practice made an unlawful employment practice by this chapter." 42 U.S.C. § 2000e-3(a). Accordingly, for Moss to establish a prima facie case for actionable retaliation under either the ADA or Title VII, he must prove "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (ADA context); *see Boyer-Liberto*, 786 F.3d at 281 (Title VII context).

### 1.  ADA Retaliation

Saja argues that Moss's "general complaints of unfair treatment" are insufficient to rise to the level of a protected activity, and that Moss cannot sustain a retaliation claim because he has not demonstrated that his termination was causally related to his complaints. (Def.'s Br. Supp. Summ. J. at 14–15.) Moss counters that he complained to Davis multiple times prior to July 4, 2021, that Davis did nothing until she fired Moss, and that the temporal proximity between the complaints and his termination is sufficient to demonstrate causation. (Pl.'s Br. Opp. p. 18, 20.)

### i.  Protected Activity

Turning to Saja's first argument, Moss has sufficiently shown that he engaged in a protected activity. It is axiomatic that "[a]n employer may not . . . take adverse employment action against an employee for opposing discriminatory practice in the workplace." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Oppositional conduct "encompasses utilizing informal grievance procedures as well as staging informal protests and *voicing one's opinions* in order to bring attention to an employer's discriminatory activities." *Id.* (emphasis added). And "[w]hen an employee communicates to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009)).

In the light most favorable to Moss, the record reflects that he did complain to his manager "[a]bout four or five, six times," about Maturo's bullying. (Moss Dep. 47:15–17.) And Maturo's bullying was based on his perception that Moss was "using [his] disability as an excuse and [his] pain as an excuse." (*Id.* 14:1–13.) When Moss would take breaks,[10] Maturo would tell him to "get [his] lazy ass up," that "[he] needed to start picking up slack," and that he was "a weak little b*tch." (*Id.*) These comments were directed at Moss's disability because they imply that he was faking, being lazy, or otherwise did not actually have a disability that

---

[10] All relevant parties were aware that Moss's disability required that he be permitted to take breaks. (Moss Dep. 37:2–11, 47:15–49:16; Holloway Dep. 31:11–19, 36:5–17.) Moss showed Maturo the scar on his chest from his double lung transplant (*id.* 37:2–11) and Maturo told Moss that he was "using his disability as an excuse" (*id.* 14:1–6) for taking breaks. Moss also made Davis aware of his condition "when [he] first started. [He] let it be known." (*Id.* 48:1–7.) And he complained to her about Maturo's bullying on account of his disability "[a]bout four or five, six times" in total. (*Id.* 47:15–17.) As such, both Maturo and Davis knew about Moss's disability.

required breaks. But when Moss complained to Davis, she did nothing despite assuring Moss that "she was going to deal with it." (*Id.* 15:3–5.) As such, a jury could believe that Moss engaged in a protected activity by complaining about Maturo's conduct.[11]

### ii. Causality

As to Saja's second argument, on the facts alleged, Moss could persuade a jury that his discharge was in retaliation for his complaints related to his disability. To demonstrate a sufficient causal connection between a protected activity and an adverse employment action, a plaintiff is required to show that his "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). But a "but-for" cause does not mean the only cause; "[o]ften, events have multiple but-for causes." *Bostock v. Clayton Cty.*, 108 S. Ct. 1731, 1739 (2020). "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).

Here, Moss complained to Davis "[a]bout four or five, six times," over the course of just a few weeks, but she did nothing to rectify the situation. On July 4, when Maturo indicated that he wanted to fight Moss in the parking lot, Davis finally reacted, but it was only to say that Moss and Maturo would need to "take [their fight] to the Walmart parking lot," which is located behind the Sonic. (Moss Dep. 15:12–20.) Minutes later, as the incident escalated, Davis

---

[11] Though not at issue here, Moss is not required to prove that the opposed conduct was actually an ADA violation, but merely that there was "a reasonable, good faith belief" that the conduct violated the ADA. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). In the absence of argument on this issue, the court believes that Moss had a good faith belief that Maturo's conduct constituted discrimination because he believed Maturo was bullying him on account of his disability and told Davis as much.

refused to intervene when Jade and Serenity assaulted Holloway and pushed Moss in his chest. And shortly after that, Davis crumpled-up Moss's tip money, "threw it at him, and told him to get the F out" of the Sonic. (Holloway Dep. 53:23–54:7.) Given the close temporal proximity between the complaints and Moss's termination, a reasonable jury could believe that Moss's complaints regarding Maturo's disability-based bullying was a "but-for" cause of his termination. *See e.g., Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (recognizing that, where a plaintiff shows that he was discharged soon after engaging in protected activity, the evidence is sufficiently suggestive of retaliatory motive); *Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 175 (4th Cir. 2014) (finding that a seven-month period between protected activity and retaliation "supports an inference of [a] retaliatory motive"); *see also Rhoads v. F.D.I.C.*, 257 F.3d 373, 394 (4th Cir. 2001).

### iii. Conclusion

For the reasons stated, there are genuine disputes of fact regarding whether Moss was terminated or otherwise retaliated against because he complained about his disability-based harassment. As such, Saja's motion will be denied with respect to the ADA portion of Count III.

### 2.  Title VII Retaliation

As it relates to Moss's Title VII retaliation claim, Saja correctly argues that Moss never complained to management about race-based discrimination until after the July 4, 2021 incident. As such, Moss never engaged in a "protected activity" under Title VII prior to an adverse employment action, and his claim must fail.

While Moss complained to Davis about Maturo's bullying, Moss concedes that Maturo did not bully him because of his race. (Moss Dep. 96:19–97:7.) Moss also testified that no one else bullied him or directed racial epithets at him until the tail-end of the July 4, 2021 incident, right before he left the Sonic. (*Id.*) And there is nothing in the record to indicate that Moss engaged in any protected activity prior to his termination (constructive or otherwise).

In the absence of a protected activity, Moss's claim for retaliation under Title VII must fail, and Saja's motion will be granted with respect to the Title VII portion of Count III.

### D. Moss's VVA Claims (Counts IV and V)

Saja contends that Moss never received the proper notice of right to sue under the VVA, and thus summary judgment should be granted on these counts. (Def.'s Br. Supp. Summ. J. at 7–8.) In other words, Saja contends that Moss never fully exhausted his state law claims, rendering them procedurally defective.

The VVA is the July 1, 2020 update of the Virginia Human Rights Act ("VHRA"). *Updegrove v. Herring*, No. 1:20-CV-1141, 2021 WL 1206805, at *1 (E.D. Va. Mar. 30, 2021). The VVA provides,

> It is an unlawful discriminatory practice for any person . . . to refuse, withhold from, or deny any individual . . . any of the accommodations . . . made available in any place of public accommodation, or to segregate or discriminate against any such person . . . on the basis of race, color . . ., [or] disability[.]

Va. Code Ann. § 2.2-3904(B). It also "prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act." *Jordan v. Sch. Bd. of the City of Norfolk*, Civil No. 2:22cv167, 2022 WL 16835868, at *11 (E.D. Va. Nov. 9, 2022) (quoting *Hice v. Mazzella Lifting Tech., Inc.*, 589 F. Supp. 3d 539, 553 (E.D. Va. 2022)). Section

2.2-3907 outlines the process by which someone can make a complaint with the Virginia Office of Civil Rights ("FEPA"), and provides that "[p]rivate citizens may only sue under the VHRA once they have 'been provided a notice of [their] right to file a civil action pursuant to § 2.2-3907.'" *Id.* at *10 (quoting Va. Code Ann. § 2.2-3908(A)).

Here, Moss concedes that he did not receive notice of a right to sue from FEPA; he only received one from the EEOC. But he argues that his failure to obtain a notice of a right to sue from FEPA does not doom his claim. Instead, he contends that a valid workshare agreement[12] exists to permit him to exhaust both his federal and state law claims by obtaining a notice of right to sue from only the EEOC. (Pl.'s Br. Opp. p. 23; Workshare Agreement [ECF No. 45-6].) To Moss's point, Virginia did amend § 2.2-3900 to state "that any regulations implementing the provisions of § 2.2-3907 of the Code of Virginia, as created by this act, shall, so far as practicable, conform to the practices and timelines of the Equal Opportunity Employment Commission with respect to analogous federal laws and regulations, *for the purpose of maintaining a workshare agreement with that agency.*" 2020 Va. ALS 1140, 2020 Va. Acts 1140 (emphasis added). But as Saja correctly points out, the only court to address this argument held that a separate right to sue notice was *required*, regardless of whether a workshare agreement was in place at the time a complaint was made or the investigation of that complaint

---

[12] The court believes it is necessary to explain workshare agreements and why they are used. Under Title VII, states that have analogous anti-discrimination laws have exclusive jurisdiction over claims that are covered by both federal and state law for 60 days. *See* 42 U.S.C. § 2000e-5(c). The federal government cannot investigate the claims until the 60-day clock runs or the state "earlier terminate[s]" its jurisdiction. Workshare agreements operate to waive the state's exclusive jurisdiction for the sake of efficiency. *Jordan*, 2022 WL 16835868, at *11. Under these agreements, the state agency ordinarily waives its right to exclusive jurisdiction and acknowledges that the EEOC's receipt of a claim operates to initiate proceedings under both state and federal statutes. *See, e.g., id.* (citing the 2021 FEPA-EEOC Work-Sharing Agreement).

was concluded. *See Jordan v. Sch. Bd. of the City of Norfolk*, 2022 WL 16835868 (E.D. Va. Nov. 9, 2022).

Indeed, in *Jordan v. School Board of the City of Norfolk*, the plaintiff argued "that the EEOC's . . . notice of her right to sue satisfied § 2.2-3907(H)'s requirements . . . ." 2022 WL 16835868, at *10. But the court disagreed, noting that "[o]nly the presentment of claims and the exhaustion of the administrative remedies before the Virginia Attorney General's Office of Civil Rights satisfy the prerequisite to filing a discrimination lawsuit in Virginia's state courts." *Id.* at *12 (quoting *Parikh-Chopra v. Strategic Mgmt. Servs., LLC*, No. CL 2021-0003051, 2021 WL 5862546, at *2 (Va. Cir. Ct. Dec. 9, 2021)). Moreover, after reviewing the workshare agreement that was in force at the time,[13] the court in *Jordan* determined that "the EEOC right-to-sue notification *did not* also serve as FEPA's right-to-sue notification." *Id.* at *11 (emphasis added). Relying on the text of the VHRA, the court found that "courts in Virginia have treated the two processes [EEOC and FEPA] as separate." *Id.* (citing *Parikh-Chopra*, 2021 WL 5863546, at *2. The court noted that the plaintiff "conflate[d] her satisfaction of the requirements of 42 U.S.C. § 2000e-5 with the separate requirement of the VHRA to meet the limited procedures recognized under Virginia law." *Jordan*, 2022 WL 16834868, at *12 (citing *Parikh-Chopra*, 2021 WL 5863546, at *2). And other "deferral" states that analyzed the issue reached the same conclusion—exhaustion of the EEOC's requirements does not automatically exhaust the state remedies. *Id.* at *12–13 (collecting cases).

---

[13] The court acknowledged that the Workshare Agreement expired halfway through the investigation of Jordan's complaint, but the court expressly stated that its holding applied "even if the FEPA-EEOC Work-Sharing Agreement controlled the Plaintiff's entire claims process . . . ." *Jordan*, 2022 WL 16835868, at *11. Here, even though Moss points to a Workshare Agreement, it has long been expired and the analysis of *Jordan* controls, dooming his position.

Moreover, the workshare agreement cited by Moss expired on September 13, 2021, *before* Moss filed his charge with the EEOC. (*Compare* Workshare Agreement at VI(F) *with* EEOC Charge [ECF No. 45-1].) As such, there was no agreement in place and Moss must have exhausted his state and federal claims separately.[14]

For these reasons, Moss's failure to request and receive a right-to-sue notification from FEPA is fatal to his VVA claims. But given the nature of these claims, the court will dismiss them without prejudice to permit Moss to request a right-to-sue notice from FEPA.[15]

## IV.   CONCLUSION

For the reasons stated, the court will grant in part and deny in part Saja's motion for summary judgment. Specifically, Saja's motion will be granted with respect to Count II and the Title VII portion of Count III, but denied as to Count I and the ADA portion of Count III. Additionally, the court will dismiss Counts IV and V without prejudice to permit Moss to properly exhaust those claims in accordance with Virginia law.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 21st day of April, 2023.

---

[14] "*Upon receipt of a written request from the complainant*, the Office shall promptly issue a notice of the right to file a civil action to the complainant . . . ." Va. Code Ann. § 2.2-3907(H) (emphasis added). "An aggrieved person *who has been provided a notice of his right to file a civil action pursuant to § 2.2-3907* may commence a timely civil action in an appropriate general district court or circuit court having jurisdiction . . . ." *Id.* § 2.2-3908(A) (emphasis added).

[15] While Moss may exhaust and then reassert his VVA claims, this Circuit recognizes the "widely accepted prohibition on duplicative damages[.]" *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 460 (4th Cir. 2011). Moss, therefore, "may not receive a double recovery under different legal theories for the same injury." *Id.* Because the same facts underlie Moss's VVA and federal claims, it is unclear whether Moss may recover damages under both theories, if he ultimately prevails on the federal claims and later refiles the VVA claims after obtaining the state's authorization to file suit. And the court will not render an advisory opinion on this potential future issue.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE